IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**KELLI H.,**

        **Plaintiff,**

   v.                                              Civil Action 2:21-cv-1097
                                                              Judge Michael H. Watson
                                                              Magistrate Judge Jolson

**COMMISSIONER OF**
**SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Kelli H., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

**I.**     **BACKGROUND**

Plaintiff protectively filed her applications for DIB and SSI on May 27, 2016, alleging her disability began on May 1, 1999. (Tr. 336–43). After her applications were denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on June 20, 2018. (Tr. 43–69). The ALJ issued a decision denying her benefits on November 1, 2018. (Tr. 150–78).

But, on October 23, 2019, the Appeals Council vacated the decision. (Tr. 179–83). Consequently, another hearing was held on April 16, 2020. (Doc. 15, Tr. 1196–1236). Still, the ALJ came to the same conclusion and denied Plaintiff's applications for benefits. (Tr. 13–40). This time, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on March 12, 2021 (Doc. 1), and the Commissioner filed the administrative record on September 13, 2021 (Doc. 12), and a Supplemental administrative record on September 21, 2021 (Doc. 15). The matter has been briefed and is ripe for consideration. (Docs. 18, 19).

### A. Relevant Hearing Testimony

The ALJ summarized Plaintiff's testimony and statements to the agency as follows:

> [Plaintiff] alleges disability due to the combined effect of physical and mental impairments, primarily knee pain, shoulder pain, neuropathy pain, PTSD and bipolar disorder. She also reports learning disability and/or intellectual disorder. [Plaintiff] alleged limitations in most physical activities. She could lift only 10 pounds and walk 50 yards. She alleged muscle tightness, nerve pain, weakness and instability of the knees, stiffness, and limited mobility. She alleged PTSD with difficulty being around others and getting along with others. She could sit, stand, and walk only short periods. She could not bend, lift, or carry. She had limited concentration due to pain and mental impairments (Exhibits B6E, B8E, B10E, B12E). At the hearing, [Plaintiff] testified that she lived alone. She had some difficulty reading and writing. She could drive. She had diabetic neuropathic pain in the right leg as well as bilateral knee pain. She had swelling of the knees in the winter. She elevated her legs at night up to six [hours] per day. She reported constant pain. She could not walk long distances. She reported bilateral shoulder pain with torn right rotator cuff. She could not reach overhead. She endorsed mental impairments including PTSD and bipolar disorder as well as depression and anxiety. She had problems going into offices and had been removed from doctors' offices, although rarely. She endorsed panic attacks three times per week. She endorsed hallucinations. She napped 10 to 20 minutes per day due to difficulty sleeping. She endorsed headaches as a side effect of medication. She could stand 30 minutes and walk five blocks before needing to rest. She had no problems sitting but reported stiffness with prolonged sitting. She could lift a gallon of milk but with difficulty. She had a few friends that helped with cooking and cleaning.

(Tr. 25–26).

### B. Relevant Medical History

The ALJ summarized Plaintiff's medical records related to her mental impairments:

> After the prior ALJ decision, the record documents diagnosis and treatment of diabetes, which required only oral medications and without complications noted. [Plaintiff] was also treated for bipolar disorder, cocaine use, and PTSD. She attended 12-step program. She was assigned a GAF of 60 in July 2013, indicative of only moderate symptoms or limitations (Exhibit B4F). Although [Plaintiff]

2

alleges disability prior to and after the April 23, 2013, ALJ decision, there is a gap in [Plaintiff]'s treatment record after 2013 until 2016. It appears that during this period, [Plaintiff] was incarcerated, as treatment notes document recent release from the Ohio Reformatory for Women. In January 2016, [Plaintiff] sought emergency room care on two occasions, first complaining of right leg pain and second of abdominal pain. Sources noted myalgia with a largely benign physical examination. [Plaintiff]'s mood, affect, and behavior were also normal. She was referred for outpatient follow-up. As to abdominal pain, [Plaintiff]'s work-up and physical exams were largely benign, with only suprapubic tenderness noted. Imaging of the knees showed only mild osteoarthritis bilaterally (Exhibit B1F). She was evaluated by primary care through OSU. [Plaintiff] reported a history of uncontrolled bipolar disorder but weaned off medication, as she believed she was "cured." On exam, [Plaintiff] appeared in no distress. She had normal muscle strength, normal gait, negative straight leg raising, good range of motion of the lumbar spine, and no sensory or motor deficits. No significant psychiatric findings were documented. [Plaintiff] had tenderness and crepitus of the knees, consistent with arthritis. She was not on medication for diabetes at that time but subsequently started oral agents (Exhibit B1F/21-25).

[Plaintiff] also reestablished mental health care through Southeast. She was referred for evaluation by Alvis house, a halfway house. She did not want psychiatric treatment because she was no longer addicted to drugs and cured from bipolar disorder. However, [Plaintiff] did subsequently start psychiatric medications. During the assessment, [Plaintiff] appeared agitated, hostile, evasive, and mistrustful. She had normal mood, however. She endorsed a history of auditory and visual hallucinations, e.g., seeing shadows, hearing voices; however, these resolved or were rare. She exhibited below average to borderline intellectual functioning. She was slightly unkempt. She was rocking during the interview but polite and cooperative. She was withdrawn and cautious in response. She provided limited information, which impacted reliability. She was clean for drugs for 10 months due to living in a controlled environment, first jail and then Alvis house. She had difficulty acknowledging the presence of substance abuse and psychiatric problems, which limited insight. She had erratic and inconsistent memory noted. Her thought processes were logical, however. She showed no overt psychosis nor delusions. She was again assigned a GAF of 60. [Plaintiff] also reestablished primary care through Southeast for chronic conditions, including joint pain and diabetes. [Plaintiff]'s exam was normal, however, other than obesity, with a BMI of 37. The source recommended conservative treatment for pain, including ibuprofen and weight loss. She was encouraged to exercise. In April, she reported some PTSD and anxiety symptoms but felt these were manageable. She denied depression and manic symptoms. She endorsed a history of hearing voices but none in one year and these were not distressing. She had no significant change in mental status exam (Exhibit B4F). In April, [Plaintiff] sought emergency room care for various concerns, including leg and back pain. On exam, [Plaintiff] had good range of motion in all joints. She had only mild tenderness at the lumbar spine. She had decreased sensation to light touch only at the right foot but maintained full 5/5

3

strength. She had negative straight leg raising (Exhibit B1F). In May, [Plaintiff] was working on a part-time basis. She was engaged in substance abuse treatment. She complained of leg pain and neuropathic pain but her exam was normal (Exhibit B4F). At a follow-up, [Plaintiff] had neuropathic pain due to diabetes but a normal diabetic foot exam. In July, [Plaintiff] was reportedly working hard at her job and towards custody of her daughter. She reported stress but did not exhibit decompensation or deterioration in symptoms or functioning. She appeared anxious but was able to interact appropriately with staff. She was living with a friend as well at that time. In September, [Plaintiff] was doing well with psychiatric medications. [Plaintiff] was assigned a GAF of 72, which is indicative of only transient symptoms with no more than slight impairment in functioning. This remained stable through October with a GAF of 75 (Exhibit B5F).

[Plaintiff] underwent a consultative physical examination in November 2016 performed by Dr. Seim. On exam, [Plaintiff] was obese with a BMI of 37. She had no difficulty getting onto the exam table. She had normal cardiovascular and respiratory exam. She had normal abdominal exam. She had tenderness at the right shoulder and mild limitations in her knees, which was worse on the left. She had intact range of motion of the spine and extremities. She had no joint erythema or tenderness. She had normal muscular development with full 5/5 strength. She had symmetrical 2+ reflexes throughout. She was able to walk without ta limp. She had minor difficulty going from sitting to standing. She was able to walk on her toes and heels without significant difficulty. She had some mild balance issues but gait was not limited on exam. She had an entirely normal exam of the extremities. She had normal sensation in the upper and lower extremities as well. Imaging of the knees showed only mild degenerative changes of the medial compartments. Dr. Seim opined that it was:

> [R]easonable for her to continue to engage in light work requiring her to lift possibly no more than 20 pounds. Standing for several hours, although being somewhat bothersome to her this could be broken up by breaks and such. She would certainly be able to handle sedentary work even to the point of possibly full time as long as her psychiatric conditions remain in good control….[I]f it is going to be more of a light work standpoint that may have to limit her hours as she currently is at around 20. Again[,] I think this just requires her finding a job that best fits her mild physical limitations (Exhibit B6F).

\*\*\*

After the consultative examination, there appears to be a gap in [Plaintiff]'s treatment history. In April 2017, [Plaintiff] received treatment for issues unrelated to allegedly disabling impairments (Exhibit B10F/29). She did not resume mental health treatment until July, with a six-month gap noted (Exhibit B10F/19). This tends to suggest overall stability in impairments. In June, at a primary care follow-up, [Plaintiff] complained of shoulder pain. Imaging and exams were consistent

4

with a tear of the rotator cuff. [Plaintiff] was referred for physical therapy. She was treated with muscle relaxers. Her exam was normal at that time (Exhibit B10F). However, [Plaintiff] did not complete physical therapy with sources noting high fear avoidance during therapy (Exhibit B8F). From a mental standpoint, she endorsed significant anxiety and panic attacks. [Plaintiff] indicated that she was unable to function. She endorsed bipolar symptoms, including irritability and impulsivity, However, notably, [Plaintiff] also reported that she was "fighting" for disability at that time. She further requested benzodiazepines but did not want "strong bipolar meds." On exam, she appeared anxious, with constricted affect, over-productive speech, circumstantial thought process, but no hallucinations, no delusions, intact attention and concentration, average intellect, and partial insight with normal judgment. Her appearance was within normal limits. She was cooperative with average eye contact and normal psychomotor activity. There was no change in her GAF rating of 75. Her medications were adjusted to cover anxiety symptoms (Exhibit B10F/19-22).

In August 2017, [Plaintiff] was evaluated for right shoulder pain. She reported re-aggravating shoulder pain due to cleaning at work. On exam, she had full range of motion, moderate discomfort with palpation over the AC joint. She had good strength with resisted abduction, internal and external rotation, no crepitus, and no deformities (Exhibit B11F). Imaging of the right shoulder showed full thickness tear with Os acrominale of the right shoulder. The source recommended arthroscopic surgical repair; however, it does not appear that [Plaintiff] underwent this procedure (Exhibit B11F, B9F). She also complained of left knee pain with laxity. She had normal gait but obesity with a BMI of 34 (Exhibit B10F). At a Sports Medicine evaluation, [Plaintiff] had normal exam of the right knee. She had limited range of motion on the left with effusion, positive anterior drawer, Lachman, and valgus stress testing, as well as tenderness and positive McMurray sign. She had intact sensation and no motor weakness. She had antalgic gait. However, [Plaintiff] had not done any formal physical therapy or injection therapy at that time (Exhibit B14F). She was evaluated for total left knee replacement but was not a candidate for this. [Plaintiff]'s exam was the same as the prior evaluation. Imaging showed progression of osteoarthritis of the left knee. The source recommended bracing and injections (Exhibit B12F). Subsequent notes document that [Plaintiff] was doing well overall other than knee pain (Exhibit B13F, 23F). She was noncompliant with diabetic medication because she "does not feel she needs them." She was noncompliant with cholesterol medications as well. However, [Plaintiff]'s exam was largely normal (Exhibit B13F/13-17). She underwent left knee injection in addition to conservative management for pain (Exhibits B13F, B15F, B22F, B23F). That claimant was doing well on follow-up with no concerns (Exhibits B15F).

In February 2018, at a mental health follow-up, there is indication that [Plaintiff] was not compliant with psychiatric medications, as these were restarted. She further alleged hallucinations but did not exhibit evidence of this on exam. She appeared irritable with labile affect, poor insight, poor attention and concentration. However,

5

at other exams, [Plaintiff] exhibited appropriate mood and affect (Exhibit B15F). Moreover, there is evidence of drug use. In March, [Plaintiff] became confrontational and argumentative. She was screamed and cussed at staff. She underwent a urine drug screen to continue pain medication (Tylenol 3) but this was positive for five controlled substances, including marijuana (THC), morphine (MOP), benzodiazepines (BZO), barbiturates (BAR), and oxycodone (OXY) (Exhibit 17F). [Plaintiff] also became "irate" at a follow-up for knee pain when she could not receive an injection (Exhibit B22F). She underwent the injection in May (Exhibit B16F, B22F). At a mental health follow-up in May, [Plaintiff]'s bipolar disorder was noted to be poorly controlled. She endorsed mood swings, depression, and concentration issues; however, [Plaintiff] also requested that the source complete paperwork related to disability. No change to her treatment regimen was made at that time (Exhibit B23F). Treatment notes through 2018 document ongoing management of knee and shoulder pain as well as diabetes without noted complications. Exams note obesity with a BMI of 34. These conditions were largely stable (Exhibit B31F). In December, mental health follow-ups note that [Plaintiff] exhibited disjointed concentration and poor insight and attention but good hygiene, no psychosis, appropriate behavior, and appropriate mood and affect. She was doing well overall (Exhibit B20F, 23F).

In January 2019, follow-up notes document stability in physical and mental conditions. Treatment notes generally document no significant change in exam findings or symptoms. She primarily received medication refills. She reported knee pain was better with medication. In June 2019, [Plaintiff] reported worsening knee pain. Through 2019, overall[,] [Plaintiff]'s conditions, including pain, were improved or controlled with medication. In November, [Plaintiff]'s chronic pain was noted to be controlled (Exhibit B31F). In July 2019, at a mental health follow-up, [Plaintiff] appeared depressed and anxious. Medications were increased. She smelled slightly of marijuana, which suggests drug use. However, [Plaintiff] indicated that anxiety and depression were generally well managed. She reported good sleep, energy, and appetite (Exhibit 23F). [Plaintiff] subsequently transferred mental health care to North Community Counseling Centers. At the evaluation in December, [Plaintiff] alleged disability due to physical and mental impairments. However, she also reported going to church and engaging in volunteer work. Moreover, [Plaintiff] subsequently indicated that she was stable and calm with medications (Exhibit B30F). In February 2020, [Plaintiff] exhibited and endorsed improvement in mood and behavior. She had full affect and stated "I am happy that I'm feeling stable" (Exhibit B30F/26). Other follow-up notes document medical stability as well (Exhibit B31F).

In November 2019, an x-ray of the pelvis showed normal hips with a "hint" of facet arthritis at the L5/S1 level. Imaging of the knees showed bilateral tricompartmental osteoarthritis. On exam, [Plaintiff] had full muscle strength, good alignment, with no effusion of the knees. The source opined that "the [claimant's] work capacity would be a sedentary type job at most if training and education made permissible, but certainly no standing or walking job would be reasonable with the degree of

6

arthritis of the knees" (Exhibit B26F; see also Exhibits B25F, B24F, B28F). (Tr. 26–30).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirement through September 30, 2011. (Tr. 20). Plaintiff has not engaged in substantial gainful activity since April 24, 2013, the day after the prior ALJ decision. (Tr. 21). The ALJ also determined that Plaintiff has the following severe impairments, consistent with the prior ALJ decision: obesity, bipolar disorder, antisocial personality disorder, mild intellectual disorder, posttraumatic stress disorder (PTSD), depression, and polysubstance use disorder. New and material evidence documents the following additional severe impairments: osteoarthritis of the bilateral knees, chronic left ACL tear; right shoulder rotator cuff tear; and diabetes with diabetic neuropathy. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (*Id.*).

The ALJ assessed Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, the [ALJ] finds that the [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that [Plaintiff] can tolerate frequent pushing and pulling and frequent climbing of ramps and stairs. She should avoid climbing ladders ropes, and scaffolds, occasional stooping, kneeling, crouching, and crawling. She can tolerate no more than frequent overhead reaching with the bilateral upper extremities. She is limited to simple, routine and repetitive tasks. She can tolerate a position where she is able to be off-task 5% of the workday. She can tolerate a position with no more than occasional changes in the work setting as to provide for low stress, no assembly line work, no interaction with the public, and only occasional interaction with coworkers and supervisors. When seated, she would need use of a footstool. During regularly scheduled breaks, she should be able to go out to her vehicle or breakroom in order to rest or nap.

(Tr. 25).

As for the allegations about the intensity, persistence, and limiting effects of Plaintiff's

7

symptoms, the ALJ found that they are not entirely consistent with the record. (Tr. 26).

Consistent with the prior ALJ decision, the ALJ determined that Plaintiff has no past relevant work. (Tr. 32). Relying on the testimony of the vocational expert ("VE"), the ALJ determined that given her age, education, work experience and RFC, there are jobs that existed in significant numbers in the national economy that Plaintiff could perform, such as a surveillance system monitor, addressor, or document preparer. (Tr. 32–34). The ALJ concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since April 24, 2013. (Tr. 34).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff raises two assignments of error. First, she says the ALJ failed to meet her burden at step five of the sequential evaluation process because she improperly relied on the VE's

testimony. (Doc. 18 at 7–12). Next, Plaintiff says the limitation on the President of the United States' power to remove the Commissioner of Social Security is unconstitutional, and thus, the Commissioner's delegation of power to the ALJ was defective. (*Id.* at 12–16).

**1. Step Five**

At step five of an ALJ's sequential analysis, the ALJ determines whether [Plaintiff], based on [Plaintiff]'s residual functional capacity and vocational factors (such as age, education, and work experience), can "make an adjustment to other work." 20 C.F.R. § 404.1520(g)(1). Although [Plaintiff] "bears the burden of proof during the first four steps, . . . the burden then shifts to the Commissioner at step five." *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 469 (6th Cir. 2017) (quotation marks and citations omitted omitted). To satisfy that burden, "the Commissioner must identify a significant number of jobs in the economy that accommodate [Plaintiff]'s residual functional capacity and vocational profile." *Id*. (quotation marks and citation omitted omitted). In doing so, the ALJ may "take administrative notice of reliable job information available from various governmental and other publications." 20 C.F.R. § 404.1566(d). The Dictionary of Occupational Titles ("DOT") "is one such publication upon which an ALJ may rely." *Springer v. Comm'r of Soc. Sec.*, 451 F. Supp. 3d 744, 765 (E.D. Mich. 2020) (citation omitted). "The ALJ may also seek the views of [a VE], who may present evidence that includes information from outside the DOT, including other reliable publications, information obtained directly from employers, or from a VE's . . . experience in job placement or career counseling." *Id*. (quotation marks and citations omitted).

Here, the ALJ identified three positions from the DOT which she found existed in significant numbers in the economy and accommodated Plaintiff's RFC: (1) surveillance system monitor; (2) addressor; and (3) document preparer. (Tr. 33). Plaintiff says that the ALJ erred by

9

relying on the VE's testimony to reach this conclusion. (Doc. 18 at 7). Particularly, Plaintiff says countervailing evidence presented by her counsel in post-hearing comments, which sought to establish that these jobs did not exist in significant numbers in the economy given Plaintiff's limitations, made the VE's testimony unreliable. (*Id.* at 9–12). This means, she says, the ALJ's conclusion was not supported by substantial evidence, and the ALJ therefore did not carry her burden at step five, requiring remand. (*Id.* at 7).

The Commissioner responds that the ALJ properly reviewed Plaintiff's objection to the VE's testimony, and simply overruled it. (Doc. 19 at 20–23). The Commissioner says the ALJ complied with regulations in investigating the basis for the VE's testimony, and it was properly within her discretion to rely on the testimony as evidence. (*Id.*). The Commissioner further argues that Plaintiff waived or at least significantly undermined her arguments about available jobs by failing to question the VE directly when afforded the opportunity at the hearing. (*Id.* at 23–29). Finally, the Commissioner says the Occupational Information Network ("O*NET"), on which Plaintiff relied in crafting her arguments regarding available jobs, is ill-suited to disability determination, and the ALJ was not required to resolve apparent conflicts between it and the DOT. (*Id.* at 29–35). Upon review, the Undersigned agrees that the ALJ followed applicable regulations and her conclusion at step five was supported by substantial evidence.

Following the hearing before the ALJ, counsel for Plaintiff sent correspondence requesting that the VE's testimony be stricken from the record. (Tr. 516–49). Counsel represented that, based on employment projections from the Bureau of Labor Statistics and reports of cognitive work conditions from O*NET, the three occupations the VE identified from the DOT presented very few available jobs for Plaintiff, given that she had less than a high school education and was limited in her RFC to only occasional interaction with coworkers and supervisors. (*Id.*). The ALJ

10

considered the objection, but overruled it, carefully outlining the standards which Social Security regulations and Sixth Circuit precedent required her to assess the VE's testimony. (Tr. 33–34). She concluded as follows:

> The representative[]s argue that the vocational expert's testimony is inconsistent and unreliable based on their own calculations of available jobs and numbers in the national economy. However, the vocational expert's testimony and opinions were based not only on the information contained in the DOT but as well as his own knowledge, skill, and expertise. Further, the jobs identified are representative occupations rather than an exhaustive list of available occupations, as the representatives' brief suggests (Exhibit B30E). It is also notable that the representative was given the opportunity to question the vocational expert at the hearing at which time the vocational expert explained the basis of his testimony and opinion related to issues raised, such as interaction with others in the workplace. The vocational expert's testimony in this regard is persuasive, as the vocational expert is highly qualified in this area and based testimony and opinion on the information contained in the DOT as well as experience and other factors in the labor market, including interviewing employers for jobs placements. Therefore, the undersigned accepts the vocational expert's testimony and finds that there is substantial evidence to support that there are jobs existing in the national economy of significant numbers that the claimant could perform in light of the residual functional capacity. Accordingly, the vocational expert's job information is found to be reliable.

(Tr. 34).

It is well-settled, as the ALJ herself identified (Tr. 33), that "the testimony of a vocational expert identifying specific jobs available in the regional economy that an individual with the claimant's limitation could perform can constitute substantial evidence supporting an ALJ's finding at step 5 that the claimant can perform other work." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 549 (collecting cases in which the Circuit "repeatedly" affirmed that proposition). The Social Security Administration ("SSA") has clarified that evidence provided by the VE "generally should be consistent with the occupational information supplied by the DOT." SSR 00-4P, 2000 WL 1898704, at *2 (Dec. 4, 2000). If there is any apparent conflict between the VE's testimony and the DOT, an ALJ is required to "elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is

11

disabled." *Id.* In such case, neither the VE evidence nor DOT is automatically dispositive; instead, an ALJ may choose to rely on the VE evidence so long as she finds the VE's explanation reasonable and provides a basis for relying on the VE's testimony rather than on the DOT. *Id.*

Although the ALJ found that the VE's testimony was inconsistent with the DOT (Tr. 33), she: (1) asked the VE to provide an explanation for the discrepancy; and (2) found that explanation reasonable and provided it as a basis for relying on the VE's testimony. Particularly, at the hearing, the ALJ asked the VE to provide the basis for any testimony inconsistent with the DOT, and he responded that any such testimony is "based on [his] experience in the labor market in today's economy and unskilled competitive work opportunities at all exertional levels." (Tr. 66). And, as the Commissioner notes, the VE's knowledge and experience was well-established by his education, certification, and employment history. (Doc. 19 at 22–23) (citing Tr. 500–01 (VE's resume)). Indeed, the ALJ noted that the VE was "highly qualified . . . ." (Tr. 34). Accordingly, she found that the VE's knowledge and experience formed a proper basis for his testimony and that his opinion was persuasive and reliable. (*Id.*).

Put simply, the ALJ satisfactorily scrutinized the VE's testimony in accordance with the pertinent guidelines. And she concluded the testimony was substantial evidence supporting that there were jobs which exist in significant numbers in the economy which Plaintiff could perform. Nothing Plaintiff now argues undermines the ALJ's conclusion to the extent that remand is necessary.

To begin, Plaintiff's concerns about the factual basis for the VE's testimony should have been raised at the hearing, when the VE was available for cross-examination. The Sixth Circuit has held that an ALJ need not inquire into the accuracy of the VE's testimony beyond what is mandated by SSR 00-4p. *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009).

Rather, any further inquiry is the "obligation [of] plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT. The fact that plaintiff's counsel did not do so is not grounds for relief." *Id.* at 168–69. Even where, as here, counsel later raises objections before the ALJ, the lack of cross-examination at the hearing provides no opportunity for the VE to explain, clarify, or withdraw his findings in light of the objections. And, as the Commissioner notes (Doc. 19 at 24–25), the failure to cross-examine the VE about conflicts in his testimony "severely undermines" later requests for relief regarding such conflicts. *Harris v. Comm'r of Soc. Sec.*, 598 F. App'x 355, 361 n.9 (6th Cir. 2015).

Even taking Plaintiff's arguments in full force, they are unavailing. The Sixth Circuit has recently considered arguments like Plaintiff's, namely that the DOT listings relied on by the VE are obsolete in light of more current information available through O*NET. *O'Neal v. Comm'r of Soc. Sec.*, 799 F. App'x 313, 316 (6th Cir. 2020). The court clarified that the DOT continues to be a "source of reliable job information . . . ." *Id.* at 318. Further, the court noted that the governing regulation lists the DOT, and not O*NET, as a reliable source of job information. *Id.* at 317 (citing 20 C.F.R. § 404.1566(d)(1)). And in 2010, the SSA determined that O*NET was not suitable for disability claims adjudication. *Id.* (citing Occupational Infor. Dev. Advisory Panel, *Findings Report: A Review of the National Academy of Sciences Report, Report to the Comm'r of Soc. Sec.* 1, 8 (June 28, 2010), https://www.ssa.gov/oidap/Documents/COMPLETE%20FINAL--Findings%20Report%20OIDAP%20062810.pdf). At base, "[b]ecause the DOT continues to be recognized as a source of reliable job information and [Plaintiff] did not cross-examine the vocational expert when [s]he had the opportunity, the vocational expert's testimony constitutes substantial evidence to support the ALJ's finding that [Plaintiff] was able to perform work that existed in significant numbers in the national economy." *Id.* at 318.

13

Accordingly, the Undersigned finds Plaintiff's first assignment of error lacks merit.

**2. Separation of Powers**

Plaintiff also contends that remand is required because a statute that provided tenure protection to the former Commissioner of Social Security, Andrew Saul, violated the separation of powers doctrine, and therefore, the decision to deny her benefits was made by individuals who lacked a proper delegation of power to make benefits determination. This contention lacks merit.

1. *Plaintiff's Constitutional Claim is Procedurally Improper*

As an initial matter, the claim is procedurally improper. Plaintiff's Complaint does not include any Constitutional claims. (Doc. 4). Rule 8(a)(2) of the Federal Rules of Civil Procedure provides, however, that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although a complaint need not provide "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At a minimum, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id*. Here, the United States Supreme Court case upon which Plaintiff bases her Constitutional claim was decided on June 20, 2020. Yet Plaintiff gave no notice, let alone fair notice, of her Constitutional claim in her March 15, 2021 Complaint. *See John R. v Comm'r of Soc. Sec.*, Case No. C20-6176-MLP, 2021 WL 5356719, *7 (W.D. Wash. Nov. 16, 2021) (finding that a plaintiff failed to comply with Rule 8 by failing to plead a separation of powers claim in complaint seeking judicial review of Commissioner's decision to deny benefits); *Shannon R. v. Comm'r of Soc. Sec.*, Case No. C21-5173, 2021 WL 5371394, at * 6–7 (Nov. 18, 2021) (same). For that reason, she failed to comply with Rule 8.

2. *Plaintiff's Constitutional Claim Lacks Merit*

But even if Plaintiff's Complaint was rule compliant, her Constitutional claim lacks

14

substantive merit. Removal of the Commissioner is governed by 42 U.S.C. § 902(a)(3) which provides that the Commissioner may only be removed from office "pursuant to a finding by the President of neglect of duty, malfeasance in office." *Id*. The parties agree that two recent United States Supreme Court cases cast doubt on the constitutionality of that provision.

In *Seila Law LLC v. Consumer Financial Protection Bureau*, the Supreme Court held that a provision that allowed the president to remove the Director of the Consumer Financial Protection Bureau ("CFPB") only for "inefficiency, neglect of duty, or malfeasance of office," 12 U.S.C. § 5491(c)(3), violated the separation of powers doctrine by insulating the director from removal by the President. 140 S.Ct. 2183, 2197 (2020). In *Collins v. Yellin*, decided one year later, the Supreme Court held that a provision limiting the President to removing the Director of the Federal Housing Finance Agency ("FHFA") only for cause similarly violated the separation of powers doctrine. 141 S.Ct. 1761, 1783 (2021) (holding that "*Seila Law* is all but dispositive"). Plaintiff asserts that like the Directors of the CFPB and the FHFA, the Commissioner of Social Security is a single officer at the head of an administrative agency, and therefore, §902(a)(3)'s attempt to impose any restraints on the President's power to remove the Commissioner also violates the separation of powers doctrine. (Doc. 18 at 12). The Commissioner agrees. (Doc. 19 at 8) (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)).

Plaintiff further asserts that because this removal provision is unconstitutional, any delegations of power by Former Commissioner Saul, including delegations of authority to ALJs or the Appeals Council who determined her benefits claims, were invalid. (Doc. 18 at 12–14). The Commissioner contends that Plaintiff's argument fails because the ALJ who determined Plaintiff's claim on August 26, 2020, held office on that date, not because of a delegation of

15

authority from Former Commissioner Saul, but because of a ratification of delegated authority in July 2018,[1] by Former Acting Commissioner Nancy Berryhill. (Doc. 19 at 11). And the Commissioner correctly notes that an Acting Commissioner is not subject to § 902(a)(3)'s removal provision, and therefore that provision's constitutionality, or lack thereof, is irrelevant. *See Collins*, 141 S.Ct. at 1781 (because the FHFA removal restrictions only applied to the Director, "any constitutional defect in the provisions restricting the removal of a confirmed Director would not have harmed [the plaintiffs], and they would not be entitled to any relief" from actions of the Acting Director who enjoyed no such removal protections); *Thomas E. v. Comm'r of Soc. Sec.*, C21-5107-BAT, 2021 WL 5415241, *5 (W.D. Wash. Nov. 19, 2021) (finding no constitutional injury where ALJ's appointment was ratified by Acting Director Berryhill who, as Acting Director, was not subject to the removal provision in § 902(a)(3)); *Alice T. v. Comm'r of Soc. Sec.*, 8:21CV14, 2021 WL 5302141, *18 (D. Neb. Nov. 15, 2021) (same); *Boger v. Kijakazi*, No. 1:20-cv-00331-KDB, 2021 WL 5023141, * 3 n.4 (W.D.N.C Oct. 28, 2021) ("Plaintiff's constitutional 'removal restriction' argument is likely not even applicable to this case because [the ALJ] was appointed by an Acting Commissioner of Social Security who could be removed from the office at the President's discretion.") (emphasis in original).

Nevertheless, Plaintiff asserts that the ALJ and the Appeals Council adjudicated her disability application pursuant to a delegation of authority from Former Director Saul. (Doc. 18 at 12–14). The Court need not resolve this factual dispute but finds instead that even if Former

---

[1] In *Lucia*, the Supreme Court found that the United States Security Exchange Commission (SEC) ALJs were "inferior officers" under the Appointments Clause, U.S. Const. art II, § 2, cl. 2, and therefore, had to be appointed by a President, a court, or the head of an agency instead of lower-level staff. *Lucia v. S.E.C.*, 138 S.Ct. 2044, 2051 (2018). Although *Lucia* involved ALJs at the SEC, on July 16, 2018, Acting Commissioner Berryhill ratified the appointment of the Social Security Administration's ALJ's and administrative appeals judges who were previously appointed by lower-level staff in response to the ruling in *Lucia*. See SSR 19-1p, 84 Fed Reg. 9582, (2019).

Director Saul appointed the ALJ and Appeals Council judges who determined Plaintiff's benefits claim, the constitutionality of § 902(a)(3) would not warrant remand for several reasons.

First, even if the removal provision in § 902(a)(3) is unconstitutional, it would not have deprived Former Commissioner Saul of the ability to delegate power to others to decide Plaintiff's benefit claim because of the doctrine of severability. As the Supreme Court noted in *Seila Law*, "one section of a statute may be repugnant to the Constitution without rendering the whole act void." 140 S.Ct. 2208 (quoting *Loeb v. Columbia Township Trustees*, 179 U.S. 472, 490 (1900)). Indeed, even in the absence of a severability clause, when "confronting a constitutional flaw in a statute, [the Supreme Court tries] to limit the solution to the problem, severing any problematic portions while leaving the remainder intact." *Id*. (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd*., 561 U.S. 477, 508 (2010)). For that reason, in *Seila Law*, the Supreme Court found that the unconstitutional removal provision was severable from the remainder of the CFPB's governing statutes because the CFPB was capable of functioning independently even if the unconstitutional removal provision was stricken. 140 S.Ct. at 2209–10, 2245. Such is the case here. If the removal provision in § 902(a)(3) is stricken, the Social Security Administration would remain fully functional. *Alice A. v. Comm'r of Soc. Sec.*, Case No. C20-5756, 2021 WL 5514434, *6 (W.D. Wash. Nov. 24, 2021) (finding that plaintiff's separation of powers claim failed, in part, because even if § 902(a)(3) was unconstitutional it was severable from the remainder of the statutes governing the Social Security Administration); *Shaun A. v. Comm'r of Soc. Sec*., Case No. C21-5003-SKV, 2021 WL 5446878, *4 (W.D. Wash. Nov. 22, 2021) (same); *John R. v Comm'r of Soc. Sec*., 2021 WL 5356719, *8 (same).

In addition, even if the removal provision in § 902(a)(3) is unconstitutional, that would not have automatically rendered Former Commissioner Saul's appointment invalid, and thus, it would

17

not have automatically invalidated his actions, including delegating authority to make benefits determinations or ratifying such delegations. In *Collins*, the Supreme Court found the unconstitutional removal provision did not render the FHFA's appointments invalid, and thus did not automatically void the FHFA's actions under the Director. 141 S.Ct. 1787 ("Although the statute unconstitutionally limits the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA [that were challenged on appeal] as void."). Accordingly, infirmities in removal provisions do not automatically void appointments or actions taken by properly appointed officials. *Alice A. v. Comm'r of Soc. Sec.*, 2021 WL 5514434, *6 (finding that '[t]he infirm *removal* provision does not render Commissioner Saul's *appointment* invalid, which in turn does not render the ALJ's disability determination void.") (emphasis in original); *John R. v Comm'r of Soc. Sec.*, 2021 WL 5356719, *8 (finding that the unconstitutional "removal provision does not render the Commissioner's appointment invalid, and thus does not automatically void the SSA's actions under the Commissioner").

Instead, to obtain reversal of an agency decision, a plaintiff must show "compensable harm" flowing from an unconstitutional removal clause. *Collins*, 141 S.Ct. 1788–89 (remanding for further proceedings to determine whether compensable harm to Plaintiff occurred due to the President's inability to remove a Director of the FHFA except for cause). Here, Plaintiff makes no such showing. Plaintiff asserts that her injuries flow from an illegitimate delegation of power resulting in an invalid adjudication and determination by the Appeals Council. (Doc. 18 at 12). In so doing, Plaintiff appears to conflate issues that might have presumably flowed from the unconstitutional *appointment* of Former Director Saul with a provision allowing for his unconstitutional *removal*. As explained above, however, appointments are not nullified by an

18

unconstitutional removal provision. Nor are actions taken by a properly appointed official.

In short, Plaintiff has not pointed to a connection between any unconstitutional limit on Former Director Saul's removal and the ALJ's determination denying her benefits. *See also Calcutt v. FDIC*, No. 20-4303, 2022 WL 2081430, at *14–15 (6th Cir. June 10, 2022) (holding that "*Collins* [ ] provides a clear instruction: To invalidate an agency action due to a removal violation, that constitutional infirmity must 'cause harm' to the challenging party[,]" and "vague, generalized allegations" of harm do not demand relief); *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1138 (9th Cir. 2021) (finding that "there is no link between the ALJ's decision awarding benefits and the allegedly unconstitutional removal provisions. And nothing commands us to vacate the decisions below on that ground."). Nor is it likely that Plaintiff could do so, given that any particular ALJ or Appeals Council decision would not concern the President. *Cf. Collins*, 141 S.Ct. at 1802 (Kagan, J. concurring) ("The SSA has a single head with for-cause removal protection . . . But . . . I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone . . . . When an agency decision would not capture a President's attention, his removal authority could not make a difference.").

For all these reasons, the Undersigned finds that Plaintiff's separation of powers claim lacks merit. Accordingly, the Undersigned does not reach the Commissioner's alternative arguments including harmless error, de facto officer, the rule of necessity, and other prudential considerations.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that judgment be entered in favor of Defendant.

## V. PROCEDURE ON OBJECTIONS

19

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: July 19, 2022  /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE